**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

November 24, 2025

**BY ECF**

Hon. Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

RE:    **United States v. Jonathan Banyan**
       **25 Cr. 208 (JSR)**

Dear Judge Rakoff:

Jonathan Banyan is more than a recitation of his past criminal history. He is "not a bad person." Letter of Okeithea Saint Luc, Ex. A. He is a brother. A cousin. A son. And a father. But he "did not have support growing up. He never had a real mother or father." *Id.* Against all odds, Mr. Banyan has established a life for himself—a full-time job, a loving daughter, a stable home. Incarcerating him now serves no purpose.

Given Mr. Banyan's stale criminal record, success under pretrial supervision, and the nature and circumstances of the offense, I respectfully request that Your Honor sentence Mr. Banyan to time served with three years of supervised release. This sentence emphasizes the rehabilitative aim of sentencing, recognizing Mr. Banyan's continued employment and contributions to his family throughout his more than seven months on pretrial release. *See* 18 U.S.C. § 3553(a). And it does not create unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a)(6). *See, e.g.*, *United States v. Delgado*, 25 Cr. 79, ECF No. 16 (S.D.N.Y. Sept. 26, 2025) (McMahon, J.) (sentencing defendant with a Guideline range of 21 to 27 months to time served (zero months in prison) after conviction for unlawful possession of a firearm after fleeing from police while absconding from parole). Under the circumstances, such a sentence would be sufficient, but not greater than necessary.

I.    **Background**

Jonathan Banyan describes his childhood as "rough." This is a searing understatement. Jonathan was a small child when his mother began abusing crack cocaine and alcohol. He recalls

being left home alone with his young siblings for days at a time. Presentence Report ¶ 39. His "mother put drugs and alcohol in front of all her kids. She didn't care." Letter of Okeithea Saint Luc, Ex. A.

The older siblings parented the younger siblings. While his mother fed her addiction, Jonathan relied on his older sisters for food. Frequently, the older siblings walked over an hour to their grandmother's home in Brownsville so they could eat. At other times, Jonathan's mother directed the children to steal food from grocery stores and restaurants. Presentence Report ¶ 39. "We would use our mom's food stamps and sometimes we'd run errands for our neighbors to earn a little bit of money." Letter of Okeithea Saint Luc, Ex. A. "As he got older, Jonathan relied on school for breakfast and lunch, as well as leftovers sent home with him at the end of the school day for dinner." Letter of Focus Forward, Ex. B. Jonathan's "daily meals were often limited to rice, applesauce, or peanut butter sandwiches." Presentence Report ¶ 39. His sisters "were the ones who fed [their] younger siblings, got them ready for school, washed their clothes, and even combed their hair." Letter of Okeithea Saint Luc, Ex. A.

As children, Jonathan and his siblings suffered abuse. When his mother left the children alone, Jonathan was "fondled." Presentence Report ¶ 40. He remembers being six years old when he was twice molested by a family friend who had been responsible for watching Jonathan and his siblings in his mother's absence. *Id.* Often, when she was home, Jonathan's mother "struck his sisters with a leather belt and pulled their hair." *Id.* Though Jonathan escaped his mother's physical abuse, he heard his mom hitting his sisters. He didn't consider it abuse at the time; it was routine.

Jonathan fared no better in his father's care. His father lived in a nearby apartment building, where Jonathan and his siblings would visit. *Id.* ¶ 41. Though Jonathan's father "was well-meaning" with "good intentions," he "had over twenty children" and "was not available to focus regularly on the needs of Jonathan and his sisters." Letter of Focus Forward, Ex. B. During visits with his father, Jonathan "witnessed his father selling drugs." *Id.* Specifically, he saw his father making hand-to-hand transactions when he was just six or seven years old.

Jonathan's older sister remembers being removed from their mother's care "many times." Letter of Okeithea Saint Luc, Ex. A; *see also* Presentence Report ¶ 42. The Administration for Children's Services (ACS) often visited in response to Jonathan's "frequent absences" from school, only to discover "that his mother had left her children home alone unsupervised." *Id.* The kids were sent to live with their aunt "and then returned to our mom and then removed again." Letter of Okeithea Saint Luc, Ex. A. As a child, Jonathan did not understand why he was removed from his mother's care; he considered his upbringing normal. Jonathan was five years old when he last lived with his mother. *Id.*

When he was seven years old, Jonathan and two of his siblings were placed in foster care; his older sisters went to live with their grandmother. Jonathan and his siblings rotated through the foster care system, residing in five different foster homes before landing with Cordella Banyan, the woman who would eventually adopt him. Jonathan reveals, "My foster mom was terrible. She used cocaine and would beat us and put us down." Letter of Jonathan Banyan, Ex. C. While in Ms.

Banyan's care, Jonathan had no contact with his mother, who neglected to attend supervised visits arranged by ACS. *Id.* Ms. Banyan "resented having to travel to the supervised visits." *Id.*

In foster care, Jonathan and his siblings suffered both physical and emotional abuse. Ms. Banyan "often put him down over his mother's substance use issues, and struck him with leather belts, extension cords, and other household items." Presentence Report ¶ 43. As an alternate form of punishment, Jonathan's foster mother "forced him to stand in the corner for up to five hours" until his feet swelled. *Id.* "We had marks all over us from her punishments." Letter of Jonathan Banyan, Ex. C. Petrified of their foster mother's threatened retribution, the children concealed the abuse. Presentence Report ¶ 43.

Jonathan and his siblings lived with Cordella Banyan for seven years. Eventually, she adopted them; Jonathan legally became a Banyan.

One day, while playing on the phone and rifling through the White Pages, Jonathan and his sister searched for people with their original family name. Presentence Report ¶ 44. They struck gold. Jonathan rang his sister, Okeithea; she went to see her siblings that night. *Id.* Okeithea observed firsthand that her siblings "were sleeping on mattresses on the floor and that they weren't allowed in the kitchen." Letter of Okeithea Saint Luc, Ex. A. She also witnessed the physical effects of the years of abuse. "They had scars all over their bodies." *Id.*

Buoyed by their sister's support, the siblings hatched a plan: one night, Jonathan's brother, visibly scarred from the beatings he endured, fled to the local emergency room and reported the abuse. *Id.* Jonathan and his siblings waited for ACS to initiate an investigation. Presentence Report ¶ 44. They did.

Jonathan was removed from Ms. Banyan's home. He was placed with another foster family in Brooklyn before moving to kinship foster care with his aunt while Okeithea took classes to become a foster parent. Finally, he moved in with Okeithea. At the time, she was in her 20s with three children of her own, but she felt she "needed to take care of [her] siblings." Letter of Okeithea Saint Luc, Ex. A.

By then, foster care had taken its toll. Jonathan "grew up accustomed to mistreatment." *Id.* He "just thought that it was normal." *Id.* Okeithea witnessed the aftermath of her siblings' experience in foster care: "The boys and my sister had a lot of mental and behavioral problems because of the trauma they went through." *Id.* Okeithea did the best she could, but as a young mother with a full-time job, she could not keep close tabs on Jonathan. Jonathan was finally safe, but he began to act out.

In 2003, when he was just 16 years old, Jonathan was adjudicated a youthful offender for misdemeanor assault. The next year, he was adjudicated a youthful offender for robbery after taking Tylenol "and other medical items" from Gristedes Supermarket without paying. Presentence Report ¶ 28. Jonathan's most recent conviction, for criminal possession of a weapon,

3

occurred in 2006, when he was just 19 years old. *Id.* ¶ 29. During this incident, an officer shot Jonathan in the arm.[1]

In 2020, Mr. Banyan earned his High School Equivalency Diploma, *id.* ¶ 66, and returned home. At home, "he had a few good friends who got him back in the job market, and he had [his older sister.]" Letter of Okeithea Saint Luc, Ex. A. "He was working right away, staying out of trouble, doing everything right." *Id.*

The morning of April 7, 2025, Mr. Banyan, carrying a book bag, walked into the public entrance of 500 Pearl Street to begin his first day of jury selection as the plaintiff in a civil lawsuit against the NYPD. As he made his way through security, Mr. Banyan placed the book bag onto a conveyor belt with an x-ray scanner. The machine alerted. Court officers emptied the backpack. Inside of an opaque black bag, inside of the book bag, they recovered bullets.

Mr. Banyan was arrested for unlawful possession of ammunition, in violation of 18 U.S.C. § 922(g)(1), and presented in magistrate court the next day. Following his presentment, Mr. Banyan was ordered released with conditions. Mr. Banyan was indicted for one count of unlawful possession of ammunition and began trial on the sole count of the indictment on July 21, 2025. A jury convicted him of the offense.

Mr. Banyan is scheduled to appear for sentencing on December 1, 2025 at 11:00 a.m.

## II.     Probation calculates the applicable Sentencing Guidelines range as 18 to 24 months' incarceration.[2]

Notwithstanding its calculation of an advisory Guideline range of 18 to 24 months' incarceration, Probation recommends a downward variance, for a sentence of 12 months' incarceration. Presentence Report at 26.

Probation also advises the Court to impose a three-year term of supervised release with a number of special conditions, including outpatient mental health treatment and submission to a

---

[1] In his presentence interview with Probation, Mr. Banyan said that when he was younger, after moving in with his sister following years in an abusive foster home, he spent more time in the streets and began "gang banging." Presentence Report ¶ 45. This was a reference to his convictions during adolescence. The government's assertion that Mr. Banyan admitted to "gang banging" in 2014 and 2016 is deliberately stripped of all context and intentionally misleading. ECF No. 58 at 4. As reflected in the presentence report, Mr. Banyan explicitly denied culpability for the 2014 case that was dismissed. Presentence Report ¶ 34.

[2] Because Mr. Banyan was convicted after trial and maintains his appellate rights, Probation's calculation excludes a two-point reduction for acceptance of responsibility, which would bring his advisory Guideline range to 12 to 18 months' incarceration. U.S.S.G. § 3E1.1.

4

search of all electronic devices and media. The defense respectfully objects to Probation's recommended special condition permitting a search of all electronic devices.[3]

As the Second Circuit has reiterated, "'There must be a reasonable relationship between the factors considered by the district court in the individualized assessment and the special condition of release being challenged,' and the condition 'must impose no greater restraint on liberty than is reasonably necessary to accomplish sentencing objectives.'" *United States v. Salazar*, No. 22-1385-CR, 2023 WL 4363247, at *2 (2d Cir. July 6, 2023) (quoting *United States v. Haverkamp*, 958 F.3d 145, 151 (2d Cir. 2020)). Because the special conditions at issue are neither reasonably related to Mr. Banyan's offense of conviction or criminal history and involve a deprivation of liberty greater than reasonably necessary, the Court should not impose the conditions.

### III. Time served with three years of supervised release is the most appropriate sentence for Jonathan Banyan.

As Your Honor is well aware, Section 3553(a) of Title 18 of the United States Code directs the Court to impose a sentence "sufficient, but not greater than necessary" to achieve the goals of retribution, deterrence and rehabilitation. In consideration of these aims, Your Honor should sentence Mr. Banyan to time served. A carceral sentence in this case would only serve to

---

[3] The Second Circuit has upheld electronic search conditions where "the conduct underlying a conviction or prior conviction has involved the use of computers or other electronic devices." *United States v. Thomas*, 827 F. App'x 72, 75 (2d. Cir. 2020) (summary order). But Mr. Banyan has not been convicted of any offense involving the use of a computer or electronic device. *See generally United States v. Griffin*, 839 F. App'x 660, 661 n.5 (2d Cir. 2021) (summary order) (noting "puzzlement" over how the electronic search condition is reasonably related to defendant's robbery conviction). Courts in this district routinely decline to impose this special condition when requested by probation without sufficient justification pertaining to a search of all electronic devices. *See, e.g.*, *United States v. White*, 24 Cr. 300 (DEH) (declining to impose electronic search condition when requested by probation in possession of firearm case); *United States v. Moore*, 24 Cr. 250 (MMG) (same); *United States United States v. Williams*, 20 Cr. 489 (JMF) (declining to impose electronic search condition when requested by probation in possession of ammunition case); *United States v. Porter*, 20 Cr. 459 (RMB) (same); *United States v. Alba*, 21 Cr. 150 (VSB) (same); *United States v. Putnam*, 20 Cr. 362 (KPF) (same); *United States v. James Garcia*, 22 Cr. 450 (RA) (same and noting "the special condition with respect to electronic devices is not appropriate here and not tethered in any way to the nature of the crimes charged"). *See also United States v. Dozier*, 22 Cr. 601 (AKH) (declining to impose electronic search condition when requested by probation in carjacking case); *United States v. Searles*, 19 Cr. 381 (GBD) (declining to impose electronic search condition when requested by probation in Hobbs Act Robbery case); *United States v. DeJesus*, 20 Cr. 397 (PGG) (declining to impose electronic search condition when requested by probation in fraud case). This Court should do the same.

destabilize Mr. Banyan and his two-year-old daughter without forwarding the objectives of sentencing.

While on pretrial release, Mr. Banyan "reports as directed by telephone weekly and in person each month." Presentence Report ¶ 4. He "has been in full compliance with his conditions of mental health and substance use treatment." *Id.* While he tested positive for marijuana "shortly after his arrest," Mr. Banyan "has not produced a positive drug test since that time." *Id.*

### A.    *Jonathan Banyan's strong community ties and relationship with his family counsel in favor of a non-incarceratory sentence.*

Jonathan Banyan has spent the last several years constructing a life worth living. His two-year-old daughter is at the epicenter of that universe. "Every day I wake up and think of ways to better my daughter's life. She is my whole world." Letter of Jonathan Banyan, Ex. C.

"Jonathan's very challenging childhood no doubt informs his determination to be a good father to ███████ Letter of Focus Forward, Ex. B. Mr. Banyan is determined to be the father he never had.

While on pretrial release, Mr. Banyan participated in the Focus Forward Project, *see infra* Part III.E., and delivered a speech to the class about his daughter's birth "as the pivotal event in his life…." Letter of Focus Forward, Ex. B. He described "the intense, immediate connection he felt towards her as a newborn" and identified her "as his source of inspiration." *Id.* He said: "'She motivates me every day to make better choices and to keep in mind that I have to be a great father to her at all times.'" *Id.*

Mr. Banyan works hard every day to provide his daughter with the safe, stable life he never enjoyed as a child. "I buy her flashcards and go over them with her so that she can learn to pronounce more words. I buy her books and read them to her. I was the one who potty trained her. I'm raising her. I am so thankful to have gotten this apartment for myself and for her to grow up in." Letter of Jonathan Banyan, Ex. C.

"Jonathan is deeply devoted to his daughter." Letter of Njeri Randolph, Ex. D. Facilitators in the Focus Forward Project were "struck" by Mr. Banyan's efforts to foster his daughter's social growth. Letter of Focus Forward, Ex. B. "Believing that further stimuli from peers and adults would help ███████ acquire social and communication skills, Jonathan took the initiative to investigate convenient playgroup/daycare programs where she could participate in group activities with other children her age. He shared his research with ███████ mother and took the further step of starting the application process, including obtaining her immunization records to include with the applications." *Id.*

Mr. Banyan consistently seeks guidance to improve his parenting. While they were living together, Mr. Banyan asked his cousin's wife "for help or advice on how to treat a baby rash or when to start potty training." Letter of Njeri Randolph, Ex. D. "When he introduces his daughter to new foods, he makes sure to be careful and prepared." *Id.*

Mr. Banyan shares equal, joint custody with his daughter's mother—one week on, one week off. Presentence Report ¶ 48. But Jonathan is the primary financial provider. "Her mother doesn't work, so he takes care of buying diapers, food, wipes, all her clothes and shoes, basically everything." Letter of Njeri Randolph, Ex. D. "In addition to the strength he derives from his consistent desire and resolve to provide, both financially and emotionally, for ███ he finds strength from his work and his desire to excel at it." Letter of Focus Forward, Ex. B.

Jonathan Banyan works "every day of the week." Letter of Jonathan Banyan, Ex. C. On Mondays, Wednesdays, Thursdays and Fridays, he works a ten-hour shift as a Resident Manager for the Black Veterans for Social Justice in Brooklyn, where he has worked since 2023. There, he assists residents with complaints and emergencies, [and] manages building operations and maintenance." Letter of Focus Forward, Ex. B. After "clock[ing] in at the headquarters" and consulting with his supervisor, Mr. Banyan "head[s] to one of the eleven buildings [he is] in charge of cleaning and upkeeping." Letter of Jonathan Banyan, Ex. C. Mr. Banyan "take[s] out the trash, sweep[s] the entire building, inspect[s] the basement, and check[s] on the tenants to see if there are any new requests or needs." *Id.*

Mr. Banyan "takes pride in his work and brings essential qualities to the job, including reliability, consistency, professionalism – even when under stress – good communication skills, and the ability to connect with both customers and coworkers." Letter of Focus Forward, Ex. B. Recently, his supervisor "described him as going 'above and beyond.'" Letter of Focus Forward, Ex. B.

On the days he is not working for Black Veterans for Social Justice, Mr. Banyan works security. *Id.* "[A] crucial reason for taking on the second job was to enable him to save $200 each week to create a nest egg for clothes and toys his daughter will need in the future." *Id.*

In his spare time, Mr. Banyan prays and spends time with his family and friends. For a few months, while living with his cousin, Mr. Banyan contributed to household expenses and helped with their newborn. Letter of Njeri Randolph, Ex. D. "He'd babysit if I had to go to an appointment and contribute to our groceries." *Id.* Since moving out, Mr. Banyan has continued to help around his cousin's house. "I had surgery a few weeks ago, and he has been helping us with everything. My baby pulled the curtains down from the wall one day, and he came and fixed them. If my car isn't working, I call him. If I'm hungry, I call him and ask, "Have you eaten yet?" and he knows to bring me food from our favorite halal place." *Id.*

Having converted years ago, Mr. Banyan remains "devoted to Islam. He prays every morning, attends events, celebrates all the holidays, and goes to mass. He chose to turn his life around. He chose Islam to keep his life in the straight path." Letter of Okeithea Saint Luc, Ex. A.

In short, as another of Mr. Banyan's cousins recognizes, "Jonathan is a good person. He's easy-going and kind. He has a really good heart. If I ever need any help, I can always rely on him." Letter of Teddy Farmer, Ex. E.

7

### B.    *Jonathan Banyan's age at the time of his prior offenses is a mitigating factor.*

Apart from the instant offense, Mr. Banyan's criminal history is comprised of three offenses, including two youthful offender adjudications (one for a misdemeanor offense), all of which occurred when he was between 16 and 19 years old, while his adolescent brain was still developing. *See* Johnson, *et al.*, *Adolescent Maturity and the Brain*, J. Adolescent Health 2009. Mr. Banyan is now 39 years old. Nearly 20 years have passed since his most recent prior conviction.

In *Miller v. Alabama*, the Supreme Court insisted that "a sentencer have the ability to consider the 'mitigating qualities of youth.'" 567 U.S. 460, 476 (2012) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)).

> As we observed, "youth is more than a chronological fact." It is a time of immaturity, irresponsibility, "impetuousness[,] and recklessness." It is a moment and "condition of life when a person may be most susceptible to influence and to psychological damage." And its "signature qualities" are all "transient."

*Id.* at 367, 472 n.5 (internal citations omitted) ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance.").

This applies with force to Jonathan Banyan. Functionally abandoned by his parents, Jonathan was parented by his older siblings when he was a small child. Uprooted from his mother's home and thrust into foster care by the time he was seven, Jonathan experienced the hallmarks of childhood trauma, making him more likely to act out: he witnessed his father sell drugs; observed as his mother beat his sisters; went hungry in a home without food; suffered sexual abuse at the hands of a caretaker and physical abuse at the hands of his adoptive foster mother. These experiences undoubtedly affected his development and contributed to his involvement in the criminal justice system at a young age. Indeed, children who have experienced foster care are "more likely to offend at an earlier age, spend more time incarcerated, and commit offenses at a frequency that is far greater than offenders who had not experienced foster care." Sydney L. Goetz, *From Removal to Incarceration: How the Modern Child Welfare System and Its Unintended Consequences Catalyzed the Foster Care-to-Prison Pipeline*, 20 U. MD. L.J. RACE, RELIGION, GENDER & CLASS 289, 295 (2020) (internal quotation marks omitted).

Despite this, as this Court has observed, "The number of people who committed a crime before the age of 21 who committed crimes after 35 is very small, so there is a maturing factor that the Court, I think, has to take account of…. But I don't think that I can ignore the fact that the great majority of people from his kind of situation, who commit crimes when they're young, don't commit crimes when they're older." *United States v. Perkins*, 19 Cr. 705, ECF No. 71, (S.D.N.Y. Oct. 7, 2021) (Rakoff, J.) (sentencing defendant with a Guideline range of 70 to 87 months to 24 months' incarceration following conviction for unlawful possession of a loaded firearm after fleeing traffic stop). Jonathan Banyan's behavioral patterns as a teenager reflect choices made by a young person with a stunted ability to make complex decisions and properly weigh risks.

### C.      *The nature of the offense counsels in favor of a non-incarceratory sentence.*

The government argues that "the danger is obvious" when one brings ammunition to the courthouse. ECF No. 58 at 5. But without a firearm—which Mr. Banyan did not bring into the courthouse, and which there is no evidence of Mr. Banyan possessing in the past decade—the inherent danger of bullets boggles the mind. And it diverges from the government's theory of the case. At trial, the government's closing argument underscored its belief that Mr. Banyan simply "forgot" that ammunition was in his book bag until the magnetometer alerted in the courthouse. As the government argued to the jury, there is no evidence that Mr. Banyan purposely or intentionally brought ammunition to the courthouse—that was not a question for the jury to consider. The government is grasping at straws.

Indeed, the nature and circumstances of this offense are comparatively far *less* dangerous than comparable cases in this district, where individuals are charged with and convicted of unlawful possession of ammunition after having fired a gun. That is not the case here. While bullets and guns tend to go hand in hand, Mr. Banyan had no firearm. Instead, according to the government, Mr. Banyan mistakenly brought bullets into the courthouse with no plausible intent to use them.

Inconceivably, the government seeks to punish Mr. Banyan for exercising his constitutional right to trial. Specifically, the government asserts that the Court should impose "a substantial sentence" because of his "victimization of Omar Alston." ECF No. 58 at 5. This is absurd. The jury did not convict Mr. Banyan of lying to the government about Mr. Alston. The jury convicted Mr. Banyan of knowingly possessing bullets in a backpack. The government could have proven its case however it chose. It was the government—not Mr. Banyan—who phoned Mr. Alston on April 7 to question him about the ammunition; it was the government—not Mr. Banyan—who hounded Mr. Alston when he was hospitalized, insisting on repeated interviews with government agents; and it was the government—not Mr. Banyan—who compelled Mr. Alston to testify as a witness in its case-in-chief. The Court should decline the government's invitation to punish Mr. Banyan for exercising his constitutional rights.

### D.      *A non-incarceratory sentence would not create unwarranted sentence disparities.*

A sentence of time served is not inconsistent with the sentences imposed on defendants convicted of similar offenses and would therefore not create "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).[4] *See, e.g.*, *United States v. Harris*, 21 Cr. 338, ECF No. 12 (S.D.N.Y. Feb. 17, 2022) (Rakoff, J.) (sentencing defendant with a Guideline range of 30 to 37 months to nine months' incarceration, including eight months already served, after conviction for discharging firearm in the air in the Bronx in the middle of the night); *United States v. Wayne*, 22 Cr. 631, ECF No. 69

---

[4] Notably, all of these cases involve unlawful possession of a firearm in violation of 18 USC 922, the statute under which Mr. Banyan was convicted. But it is worth emphasis that Mr. Banyan did not possess a firearm on April 7, 2025. Nor did he possess bullets in the form of shell casings recovered in the aftermath of a shooting, or flee from law enforcement.

(S.D.N.Y. Sept. 10, 2024) (Gardephe, J.) (sentencing defendant with a Guideline range of 46 to 57 months to time served (zero months in prison) after conviction for unlawful possession of a firearm after fleeing police stop); *United States v. Foster*, 25 Cr. 58, ECF No. 40 (S.D.N.Y. Oct. 24, 2025) (Swain, J.) (sentencing defendant with a Guideline range of 37 to 46 months to time served (zero months in prison) after conviction for unlawful possession of a firearm recovered in defendant's bedroom during probation search); *United States v. Mouzon*, 16 Cr. 284, ECF No. 53 (S.D.N.Y. Mar. 27, 2017) (McMahon, J.) (sentencing a defendant with a Guideline range of 30 to 37 months to time served (zero months in prison) after conviction for unlawful possession of a firearm recovered during warranted search of apartment); *United States v. Garcia*, 18 Cr. 178, ECF. No. 51 (S.D.N.Y. Apr. 8, 2019) (Torres, J.) (sentencing a defendant with a Guideline range of 15 to 21 months to time served (zero months in prison) after conviction for unlawful possession of a firearm recovered during traffic stop); *United States v. Fayton*, 23 Cr. 001, ECF No. 47 (S.D.N.Y. May 21, 2024) (Rochon, J.) (sentencing defendant with a Guideline range of 21 to 27 months to five years of probation (zero months in prison) following conviction for possession of a firearm in a car).

### E.    *A sentence of time served is "sufficient, but not greater than necessary" to achieve a deterrent effect.*

Given Mr. Banyan's exemplary conduct on pretrial release, his full-time employment, and his responsibilities as a co-parent to his two-year old daughter, a period of incarceration serves no one, and there is no evidence of its general deterrent effect.

As Mr. Banyan has proven since April, incarceration is unnecessary for incapacitation or to protect the public. Apart from the instant matter, Mr. Banyan's most recent conviction stems from an offense committed in February 2006—nearly 20 years ago—when he was still a teenager.

Nor is incarceration necessary as a specific deterrent. Jonathan Banyan has complied with the conditions of community supervision since his arrest more than seven months ago. His steady employment throughout his entire period of pretrial release is an indicator of his low risk of recidivism. "Indeed, study after study has shown—and the government has repeatedly acknowledged—that secure employment is one of the best ways to combat repeat criminal conduct." *Doe v. United States*, 168 F. Supp. 3d 427, 429–30 (E.D.N.Y. 2016) (internal citations omitted).

Mr. Banyan has exceeded the conditions of his supervised release. For the past two months, he has actively participated in the Focus Forward Project, a "13-week course designed to provide both an intellectual and emotional outlet for participants as they navigate the stress and uncertainty of the pretrial phase of their federal cases." Letter of Focus Forward, Ex. B. *See also* Presentence Report ¶ 68. Mr. Banyan spends two hours each week participating in the course, which requires him to "complete weekly reading, journal, and other homework assignments." Letter of Focus Forward, Ex. B. The program facilitator describes Mr. Banyan as "an engaged member of the class" who is "conscientious about his work and participation, consistently punctual and prepared for each class, and always careful to contact us in advance to warn of a potential conflict, job or child-care related, that could delay his arrival or momentarily interrupt his participation." *Id.*

In addition, at the beginning of May, pretrial services referred Mr. Banyan to a mental health provider. Presentence Report ¶ 58. Mr. Banyan had developed a fear of law enforcement officers and suffered from frequent nightmares after having been assaulted by NYPD officers in 2015. Presentence Report ¶ 57. At the provider's recommendation, in June, Mr. Banyan underwent a psychiatric evaluation, resulting in a diagnosis of Post-Traumatic Stress Disorder. *Id.* Since then, "Mr. Banyan has been attending therapy sessions regularly… and has participated consistently in his treatment." Letter of Maxwell Sultan, LCSW, Ex. F. His provider shares:

> Throughout our work together, Mr. Banyan has engaged in therapy with good faith and genuine motivation. He has shown sincere commitment to addressing the goals we have established and has made meaningful progress toward those objectives. He has attended sessions regularly and has approached therapy with honesty and a willingness to do the difficult work required for meaningful change.

*Id.*

Despite this, the government argues that general deterrence "compels a substantial prison term" because possessing bullets in the courthouse creates the risk that "trials could be used to carry out violence" and "[m]itigating that risk requires…a substantial prison term." ECF No. 58 at 5. This argument borders on bizarre.

"[T]he vast majority of people who are committing crime are not particularly forward-looking," and "social science conclusively finds that certainty matters more than severity"– that is, people are deterred based on their likelihood of being caught, not on the length of the sentence they may receive. Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021) https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-deterrence/. In a bulletin by the National Institute of Justice, the U.S. Department of Justice echoes, "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." U.S. Department of Justice, *Five Things About Deterrence* 1, National Institute of Justice (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf.

As Mr. Banyan's trial made clear, the public entrance to 500 Pearl Street is littered with posted signs and verbal reminders from Court Security Officers about items that are prohibited in the courthouse, including ammunition. Airports and correctional facilities aside, there is nowhere a visitor is more likely to be caught with ammunition than in a federal courthouse. Indeed, officers testified at trial that courthouse arrests for this offense are exceedingly rare. Because people know not to bring ammunition into court. As the government conceded at trial, there is no indication that Mr. Banyan purposely or intentionally brought bullets into the courthouse. In the government's own words, he "forgot." No one is going to decide whether to bring ammunition into a courthouse based on Mr. Banyan's sentence in this case. A prison term is unnecessary to convey what common sense makes perfectly clear: leave your ammunition at home.

"Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." *Id.* Individual defendants' sentences, like Mr. Banyan's, should not be exploited to serve

11

the broader aims of the justice system. "[D]eterminations regarding general deterrence may be highly subjective, and we must be careful that the individual defendant is not lost in a stereotype." *United States v. Cavera*, 550 F.3d 180, 223 (2d Cir. 2008) (Sotomayor, J., concurring). This is particularly true of individuals who commit street-level offenses like unlawful possession of ammunition. *Cf. United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023) ("Public officials are the prime candidates for general deterrence because they act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." (cleaned up)); *United States v. Stein*, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) ("Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed.").

Instead, this Court should focus on supervised release, which "comes with an increased likelihood that reoffenders will be caught, thereby providing the increased certainty of punishment that is more likely to result in specific deterrence to individuals on supervised release, and potentially general deterrence as well at least to those who may associate with individuals on supervised release." *See* Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021) https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-deterrence/.

For Jonathan Banyan, a term of three years of supervised release would be no small punishment. As the Second Circuit has acknowledged, "supervised release is itself a serious sanction that imposes significant limitations on a defendant's liberty." *United States v. Brooks*, 889 F.3d 95, 101 (2d Cir. 2018). For those in Mr. Banyan's orbit, the period he spends on supervised release alone may very well result in general deterrence, as those around him would be privy to the daily restrictions on his life as a result of his conviction.

Any period of incarceration threatens to unravel Mr. Banyan's financial security and the well-being of his two-year old daughter. As this Court recognized in *United States v. Romeo*, "what would sending him to prison accomplish at this point in these circumstances, other than just a more or less likelihood that he would continue down a criminal path to the great dismay of his family, the Court, and society." 19 Cr. 13, ECF No. 54, (S.D.N.Y. Nov. 22, 2019) (Rakoff, J.) (sentenced to time served with three years of supervised release).

## IV.    Conclusion

Jonathan Banyan is imperfect. He has made mistakes. Egregious errors in judgment. But "[h]ow we treat those who have made mistakes speaks to who we are as society and is a statement about our values—about our dedication to fairness, equality, and justice, and about how to protect our families and communities from harm, heal after loss and trauma, and lift back up those among us who have earned a chance at redemption." Barack Obama, *The President's Role in Advancing Criminal Justice Reform*, 130 HARV. L. REV. 811, 865–66 (2017). Jonathan Banyan has earned that chance.

Thank you for your consideration of Mr. Banyan's request for a time served sentence.

Respectfully submitted,

*/s/*

Marne L. Lenox

*Counsel for Jonathan Banyan*

cc:     James Mandilk, Assistant U.S. Attorney